## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**MARITA V. PERCIVAL**
c/o Brown, Goldstein & Levy, LLP
120 East Baltimore St., Suite 2500
Baltimore, MD 21202,

   *Plaintiff*,

 v.

**THE UNITED STATES OF AMERICA**

*Serve on:*

  Channing D. Phillips
  Acting United States Attorney for
  the District of Columbia
  555 Fourth Street, N.W.
  Washington, D.C. 20001

  The Honorable Merrick Garland
  Attorney General of the United States
  950 Pennsylvania Avenue, N.W.
  Washington, D.C. 20530

**JOHN DOES 1–10,**

  United States Park Police
  110 Ohio Drive, SW
  Washington, D.C. 20242

  United States Secret Service
  245 Murray Lane SW – BLDG T-5
  Washington, D.C. 20223

  D.C. National Guard
  201 E. Capital Street, SE
  Washington, D.C. 20003

**JOHN DOES 11–20,**

  D.C. Metropolitan Police Department
  Henry J. Daly Building
  300 Indiana Avenue NW
  Washington, D.C. 20001

  *Defendants*.

Case No.  1:22-CV-01506

**COMPLAINT AND JURY DEMAND**

## COMPLAINT AND JURY DEMAND

Plaintiff Marita V. Percival, by and through undersigned counsel, states the following:

### INTRODUCTION

1.      Between approximately 11:00 p.m. on May 30, 2020, and shortly after midnight on May 31, 2020, local and federal law enforcement officers, without provocation, violently attacked peaceful protestors speaking out against police violence in the area in and near Lafayette Square, which sits between the White House and what is now Black Lives Matter Plaza in Washington, D.C. That night, Marita Percival was lawfully and peacefully assembling and exercising rights guaranteed to her by the First Amendment and was surrounded by others who were doing the same. Without warning, law enforcement officers deployed canisters containing chemical irritants and fired sting balls, pepper balls, flashbang grenades, and other projectiles into the crowd of peaceful protestors from a short distance away. Ms. Percival was hit with a flashbang grenade that exploded against her left arm, causing significant and permanent injuries to her arm and chest. At the time, Ms. Percival was assisting a fellow protester who had fallen off his or her bike. She was unarmed and posed no threat to any law enforcement officer.

2.      Ms. Percival was present at and participated in the protest in Lafayette Square on the evening of May 30 and morning of May 31, 2020. Like many other protestors that night, Ms. Percival went to Lafayette Square to speak out peacefully against systemic racism in the United States, particularly police brutality against African Americans and other people of color. This protest, like many across the country that week, was motivated in part by the videotaped killing of George Floyd at the hands of Minneapolis police officers on May 25, 2020. Mr. Floyd died when a police officer pinned him to the ground, on a public street, and held his knee on Mr.

Floyd's neck for eight minutes and forty-six seconds—despite Mr. Floyd's audible, repeated cries for help—while other police officers stood by and watched.

3.      The force employed against Ms. Percival was excessive and violated her constitutional rights. At the time law enforcement officers deployed chemical irritants and fired projectiles at Ms. Percival, none of the officers had any legitimate basis to believe that his or her life or physical safety was at risk; nor would any reasonable officer have thought so. Neither Ms. Percival nor anyone near her posed a physical threat to any officer or to any other person. Any reasonable law enforcement officer would understand that it is unlawful to employ force against someone who is committing no criminal offense and posing no threat to officers, other people, or property.

4.      As a result of law enforcement officers' actions on May 30 and 31, 2020, Ms. Percival sustained second-degree burns to her left arm and chest, covering approximately 15% of her body. She has also suffered and continues to suffer severe physical, mental, and emotional pain as a result of those law enforcement officers' actions.

## PARTIES

5.      Plaintiff Marita V. Percival is a citizen of the United States and a resident of Washington, D.C., who was demonstrating peacefully in Lafayette Square on the evening and night of May 30, 2020, continuing into early on May 31, 2020.

6.      Defendant the United States of America is sued for Ms. Percival's personal injuries caused by the acts or omissions of its employees. Those employees were acting within the scope of their office or employment under circumstances where the United States, if a private person, would be liable to Ms. Percival in accordance with the laws of the District of Columbia. *See* 28 U.S.C. 1346(b)(1); 28 U.S.C. § 2674.

7.      Defendants John Does 1–10 are federal officers employed by the United States Park Police, United States Secret Service, the District of Columbia National Guard, and/or other federal law enforcement agencies who directed and/or participated in the attack on peaceful protestors from in and near Lafayette Square on May 30 and May 31, 2020. They are sued in their individual capacities.

8.      Defendants John Does 11–20 are officers and agents of the D.C. Metropolitan Police Department ("MPD") and other non-federal law enforcement officers, agents, and/or officials based in the District of Columbia who directed and/or who participated in the attack on and violent removal of peaceful protestors from in and near Lafayette Square on May 30 and 31, 2020. They are sued in their individual capacities.

9.      The United States Park Police is a subdivision within the Department of the Interior, an executive agency under the President's authority. Its immediate chain of command ends with the Chief of Police; the current Chief is Pamela A. Smith, and the Acting Chief on May 30 and 31, 2020, was Gregory Monahan.[1] The United States Park Police Chief of Police oversees the Field Operations Division and "is responsible for all operational activities of the Force in the Washington metropolitan area," including the Patrol Branch, whose personnel patrol areas in and around Washington, D.C.[2]

10.      The United States Secret Service is a subdivision within the Department of Treasury, an executive agency under the President's authority. Its immediate chain of command ends with the Director, who is, and was on May 30 and 31, 2020, James Murray.

---

[1]  Office of the Chief, U.S. Park Police (Mar. 16, 2021), https://www.nps.gov/subjects/uspp/office-of-the-chief.htm.

[2] Field Operations Division, U.S. Park Police (Feb. 26, 2015), https://www.nps.gov/subjects/uspp/ops.htm.

11.     The District of Columbia National Guard's chain of command ends with the President of the United States.[3] The intermediate officer is the Commanding General; the current Commanding General is Major General Sherrie L. McCandless; and the Commanding General on May 30 and 31, 2020 was Major General William J. Walker. "[T]he Commanding General of the D.C. National Guard is subordinate solely to the President of the United States."[4] The New York Times reported on June 10, 2020: "General Walker[, the [then-]commanding general of the D.C. National Guard,] likes to call his troops 'the President's Guard' and sometimes even the 'Praetorian Guard' because of their unusual chain of command ultimately to the president. He has close ties to the Trump White House: General Walker's top legal officer, Col. Earl Matthews, once worked as a senior member of the National Security Council and left under the cloud of the Ukraine scandal last year."[5]

12.     The MPD is a law enforcement agency of the District of Columbia government, operating under the leadership of the Mayor of the District of Columbia, who is, and was on May 30 and 31, 2020, Muriel Bowser.[6] Its immediate chain of command ends with the Chief of Police, who is now Robert J. Contee III and on May 30 and 31, 2020, was Peter Newsham.[7]

---

[3] *About Us*, District of Columbia Nat'l Guard, https://dc.ng.mil/About-Us/ (last visited May 27, 2022).

[4] *Id.*

[5] Thomas Gibbons-Neff, et al., Aggressive Tactics by National Guard, Ordered to Appease Trump, Wounded the Military, Too, N.Y. Times (June 10, 2020), https://www.nytimes.com/2020/06/10/us/politics/national-guard-protests.html.

[6] Government of the District of Columbia Organizational Chart as of Jan. 15, 2019, https://mayor.dc.gov/publication/government-district-columbia-organizational-chart (attachment) (last visited May 27, 2022).

[7] Organizational Chart, Metropolitan Police Department, Feb. 21, 2020, https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/MPD%20Org%20Charts_UPDATED_02212020.pdf.

## FACTS
### For over 100 years, people have met in Lafayette Square to protest.

13.     Widespread protests gripped major cities across the United States following the death of George Floyd at the hands of Minneapolis police on May 25, 2020. Relevant to this case, in Washington, D.C., large-scale protests took place each day between May 29, 2020, and June 1, 2020, in and around Lafayette Square.

14.     Lafayette Square is located directly opposite the White House, in Northwest, Washington, D.C. It is bordered by Pennsylvania Avenue, N.W, on the south; H Street, N.W., on the north; 15th Street, N.W., on the east; and 17th Street, N.W., on the west. For more than 100 years, Lafayette Square (including its adjacent streets) has been a gathering place for political demonstrations and for groups and individuals to exercise their First Amendment rights. In other words, it has traditionally been used for the purposes of public assembly, communicating thoughts between citizens, and discussing questions of public importance.[8]

### Federal and local law enforcement officers were present in and around Lafayette Square on the evening of May 30 and morning of May 31, 2020.

15.     Federal and local law enforcement officers—including but not limited to officers and agents of the United States Secret Service, the United States Park Police, the MPD, and the District of Columbia National Guard—were present in and near Lafayette Square during the protests held there on the evening of May 30 and morning of May 31, 2020:

---

[8]  *See, e.g.*, Protest at the People's House, The White House Historical Ass'n, https://www.whitehousehistory.org/collections/protest-at-the-peoples-house (last visited May 18, 2022).

a.    At the Mayor's press conference on May 31, 2020, District of Columbia Chief of Police Peter Newsham stated that, on the evening of May 30, 2020, the U.S. Park Police and Secret Service reported violent interactions with protestors.[9]

b.    At approximately 9:30 p.m. on May 30, 2020, Ms. Percival personally observed and filmed law enforcement officers stationed near Black Lives Matter Plaza holding shields labeled "U.S. Park Police" and "Police."



---

[9] DC Mayor's Office, *Mayor Bowser Holds Media Availability, 5/31/20*, YouTube (May 31, 2020), https://www.youtube.com/watch?v=8BWpFbF9qjA.



Screen captures from video footage taken by Ms. Percival on the evening of May 30, 2020.

16.     Between May 29 and May 31, 2020, the then-President of the United States, Donald J. Trump, advocated for law enforcement officers to use violent force against civil rights protestors speaking out in the wake of George Floyd's death. President Trump made several statements that conveyed his negative views of the protestors and applauded law enforcement officers' violent responses to them. In these statements, he described the protestors in derogatory terms, celebrated officers' use of force against them, and advocated for law enforcement's continued use of force in the coming days:

a.     On May 29, 2020, the President tweeted that "the very weak Radical Left Mayor, Jacob Frey," either must "get his act together and bring the City [of Minneapolis] under

control, or I will send in the National Guard & get the job done right. . . . ."[10] ". . . .These THUGS are dishonoring the memory of George Floyd, and I won't let that happen. Just spoke to Governor Tim Walz and told him that the Military is with him all the way. Any difficulty and we will assume control but, when the looting starts, the shooting starts. Thank you!"[11]

b.     The phrase "when the looting starts, the shooting starts," was used by former City of Miami Police Chief Walter Headley in 1967 when he advocated for police brutality and discriminatory police tactics against African Americans and other people of color in order to purportedly reduce crime in Miami. Politician George Wallace, who ran on a segregationist platform, also used the phrase during his 1968 presidential campaign.[12] Twitter responded by stating that the President's tweet violated its rules by "glorifying violence."[13]

c.     On May 30, 2020, he tweeted: "Great job last night at the White House by the U.S. @SecretService. They were not only totally professional, but very cool. I was inside, watched every move, and couldn't have felt more safe. They let the 'protesters' scream & rant as much as they wanted, but whenever someone got too frisky or out of line, they would quickly come down on them, hard – didn't know what hit them. The front line was replaced with fresh

---

[10] @realDonaldTrump, Twitter (May 29, 2020, 12:53 AM), https://www.thetrumparchive.com/?searchbox=%22%5C%22get+his+act+together%5C%22%22.

[11] @realDonaldTrump, Twitter (May 29, 2020, 12:53 AM), https://www.thetrumparchive.com/?searchbox=%22%5C%22Governor+Tim+Walz%5C%22%22.

[12] Barbara Sprunt, *The History Behind 'When the Looting Starts, the Shooting Starts'*, NPR (May 29, 2020), https://www.npr.org/2020/05/29/864818368/the-history-behind-when-the-lootingstarts-the-shooting-starts; Michael S. Rosenwald, *'When the looting starts, the shooting starts': Trump quotes Miami police chief's notorious 1967 warning*, Wash. Post (May 29, 2020), https://www.washingtonpost.com/history/2020/05/29/when-the-looting-starts-the-shootingstarts-trump-walter-headley/.

[13] *See* @realDonaldTrump, Twitter (May 29, 2020, 12:53 AM), https://www.thetrumparchive.com/?searchbox=%22%5C%22Governor+Tim+Walz%5C%22%22.

agents, like magic. Big crowd, professionally organized, but nobody came close to breaching the fence. If they had they would have been greeted with the most vicious dogs, and most ominous weapons, I have ever seen. That's when people would have been really badly hurt, at least. Many Secret Service agents just waiting for action. 'We put the young ones on the front line, sir, they love it, and good practice.' As you saw last night, they were very cool & very professional. Never let it get out of hand. Thank you! On the bad side, the D.C. Mayor, @MurielBowser, who is always looking for money & help, wouldn't let the D.C. Police get involved. "Not their job." "Nice!"[14]

       d.      The President's celebration of using "vicious dogs" against the civil rights protestors gathered to demonstrate against police brutality in May 2020 alluded to historic and ongoing police practices of using dogs to intimidate, harm, and assault civil rights protestors, specifically, African Americans and other people of color.[15]

       e.      Later that day, Mayor Bowser and Chief Newsham contradicted the President's tweet concerning the MPD's lack of participation in quelling protestors' activities. Mayor Bowser stated during a press conference that MPD officers were "already involved" in responding to protestors and "supported uniformed Secret Service last night [on May 29, 2020] like we have done literally dozens of times at Lafayette Park. MPD, the U.S. Park Police, and the

---

[14] @realDonaldTrump, Twitter (May 30, 2020, 8:41 AM), https://www.thetrumparchive.com/?searchbox=%22%5C%22totally+professional%5C%22%22 (complete tweet thread) (alterations adopted).

[15] *See, e.g.*, Sydney Trent, Trump's warning that 'vicious dogs' would attack protesters conjured centuries of racial terror, Wash. Post (June 1, 2020), https://www.washingtonpost.com/history/2020/06/01/trump-vicious-dogs-protesters-civil-rights-slavery/.

Secret Service coordinated throughout the evening and night and at no time was the Chief of Police concerned about losing control of protest activity in Washington, D.C."[16]

       f.      The President also tweeted on May 30, 2020: "The professionally managed so-called 'protesters' at the White House had little to do with the memory of George Floyd. They were just there to cause trouble. The @SecretService handled them easily. Tonight, I understand, is MAGA NIGHT AT THE WHITE HOUSE???"[17]

**Ms. Percival attended the protest at Lafayette Square
on the evening of May 30, 2020, and morning of May 31, 2020.**

17.     Ms. Percival arrived at the civil rights protest at Lafayette Square on May 30, 2020, at approximately 4:00 p.m. She attended the protest with her friend.

18.     At the time Ms. Percival arrived at the protest that afternoon, the group of approximately 300 protestors was peaceful. They chanted, sang, and displayed signs reflecting their viewpoints and political demands to end systemic racism and police brutality. At times during the evening, Ms. Percival joined others in chanting "Black lives matter." She, along with the other protestors, peacefully marched from Lafayette Square to a couple of museums, to the Washington Monument, and then back to Lafayette Square. Ms. Percival and her friend protested in areas open to the public that have traditionally been available for First Amendment-protected activities.

19.     As described above, federal and local enforcement officers were present in and near Lafayette Square on the evening of May 30, 2020, and early morning hours of May 31,

---

[16] DC Mayor's Office, *Mayor Bowser Holds Media Availability, 5/30/20*, YouTube (May 30, 2020), https://www.youtube.com/watch?v=80oo-gpPQtc.

[17] @realDonaldTrump, Twitter (May 30, 2020, 9:34 AM), https://www.thetrumparchive.com/?searchbox=%22%5C%22MAGA+night%5C%22%22.

2020, including agents from the United States Park Police, United States Secret Service, the

District of Columbia National Guard, and MPD.

20.     Federal and local law enforcement officers agreed to work together and made

collective decisions about how to interact with and respond to the protestors in Lafayette Square

that evening through a "unified command" between the MPD, the District of Columbia National

Guard, and those federal agencies with agents present in and near Lafayette Square:

a.     At Mayor Bowser's press conference on May 30, 2020, Chief Newsham

stated that, on the night prior (May 29, 2020), the MPD "established unified command with the

U.S. Park Police and the U.S. Secret Service on site, which we do on the multiple occasions

when we have these instances of protests in our city. This is the common way we handle this on

a very regular basis. The unified command is established so that police departments and law

enforcement agencies and their federal partners can collectively make decisions on how to

proceed. I was in close contact with the MPD Incident Commander on the scene. The Uniformed

Secret Service had sufficient personnel to control their line. This is how we always handle these

matters in our city."[18]

b.     At the same press conference, Chief Newsham stated that the "unified

command" would continue, particularly in the areas near the White House, in order to respond to

protestors there: "Generally, down in that area, MPD has responsibility for the street. Last night,

Uniformed Secret Service has primary responsibility for protecting the White House. That is

shared with the U.S. Park Police. And we have responsibility for the street down there. So that's

why we established the unified command. The unified command has worked remarkably well in

---

[18] DC Mayor's Office, *Mayor Bowser Holds Media Availability, 5/30/20* (May 30, 2020), https://www.youtube.com/watch?v=80oo-gpPQtc.

dozens of other situations. We have protests in this city on a daily basis. To have a thousand protestors in Washington, D.C. is not uncommon, and it is a very manageable group. I keep emphasizing this—the leadership was very comfortable with the way that that happened last night."[19] Further: "All of the decisions that are made in an instance like this is made in unified command. A collective decision was made on how to proceed. That's the way we handled it last night and early this morning. That's the way that we will handle it tonight and for any ongoing demonstrations that we have in our city."[20]

        c.    Chief Newsham described the "unified command" at the May 30, 2020 press conference as follows: "It's a place where leaders, decisionmakers, get together and they collectively agree how to proceed to ensure that all of the individual responsibilities of each of the agencies is taken care of. As you know, we have a unique series of jurisdictions here in the District of Columbia. Each of the law enforcement agencies has a unique responsibility. The Metropolitan Police Department overlays most of that responsibility in that we have responsibility for the entire City. We have responsibility for local crime. We have responsibility for any demonstrations that occur in our city streets. And our ultimate responsibility is to ensure that everyone is safe when we have these types of events. Like I said earlier, I have spoken to the leadership of all of those agencies that were involved last night. They are absolutely comfortable with the decisions that were made."[21]

        d.    At a press conference on June 2, 2020, Chief Newsham supplemented his description of the "unified command": "Whenever you establish unified command, you bring in

---

[19] *Id.*

[20] *Id.*

[21] *Id.*

decision makers from the agencies that are involved in Washington, D.C. Those agencies have specific and inconsistent jurisdictions. And the idea behind unified command is to come up with a collective decision." Further, he stated: "We have a number of command posts set up throughout the city where federal and local partners can communicate, including our [command center] at Police Headquarters."[22]

21.    At all times on the evening of May 30 and early morning hours of May 31, 2020, Ms. Percival protested peacefully. When Ms. Percival arrived around 4:00 p.m. on May 30, 2020, Lafayette Square was not barricaded and was fully open to the public. Around 8:00 p.m., law enforcement placed metal barricades between protestors and officers on the south end of the Square in front of the White House. Law enforcement officers maintained a line standing immediately behind the barricades on the south side of the barricades, facing north. Most, if not all, of the officers in the line had riot shields. Members of the public were free to protest or engage in other First Amendment-protected activity in the Square up to the barricades.

22.    Around 8:00 p.m. on May 30, a small subset of protestors at Lafayette Square, not including Ms. Percival or those with her, began throwing water bottles and other non-lethal items in the direction of law enforcement officers. At that time, law enforcement officers began to indiscriminately shoot rubber bullets and release tear gas. A rubber bullet struck Ms. Percival's left leg, and her eyes, nose, and throat stung from the tear gas. While the majority of the protestors, including Ms. Percival and her friend, remained peaceful despite law enforcement's actions, other protestors, in response to the escalation initiated by law enforcement, began

---

[22] DC Mayor's Office, *Mayor Bowser Holds Media Availability, 6/2/20* (June 2, 2020), https://www.youtube.com/watch?v=HuSo85vhACQ.

throwing water bottles and setting dumpsters and trash cans on fire. Law enforcement officers continued to indiscriminately shoot rubber bullets and release tear gas at protestors.

23.    Ms. Percival and her fried left Lafayette Square, walking up Vermont Avenue N.W. to I Street N.W., where Ms. Percival had parked her car. Because law enforcement officers had blocked off I Street N.W. and were not letting protestors through, Ms. Percival and her friend walked back southward on Vermont Avenue N.W. to H Street N.W. There, Ms. Percival and her friend gathered in solidarity with other protestors at Black Lives Matter Plaza.

24.    Beginning around midnight on May 31, 2020, the violence escalated once again at the hands of law enforcement. Without warning and without giving protestors any instructions, law enforcement officers began to indiscriminately shoot flashbang and/or stun grenades into the crowd. Such grenades, when landing on a human body, are known to result in serious injury or even death. When used at all, they are supposed to be shot into the air, to explode above people's heads. Ms. Percival heard at least four grenades shot after midnight.

25.    As a result of law enforcement's aggressive and unwarranted response, the crowd of protestors began retreating backwards down H Street towards Vermont Avenue, facing the lines of law enforcement officers so they could see when the officers were going to shoot a projectile. Protestors were injured by law enforcement officers' actions.

**Ms. Percival was shot in the arm by law enforcement without provocation and without warning while she was assisting a fellow peaceful protestor.**

26.    Ms. Percival was in a crowd of protestors that was retreating—moving away from law enforcement officers' violent acts—and at all times was in areas that were available for the exercise of First Amendment-protected activity.

27.    While Ms. Percival was retreating from law enforcement along with the rest of the protesters, she noticed one of her fellow protestors who had fallen off her bike and moved

forward to help her. Neither she, nor any of the other protestors posed a threat. Nevertheless, law enforcement officers fired flashbang grenades directly into the group of retreating peaceful protestors.

28.    Ms. Percival was standing in the middle of H Street, between Black Lives Matter Plaza and Vermont Avenue,  assisting the fellow protestor, when one of the flashbang grenades, which was fired by an unidentified law enforcement officer, landed in the crease of Ms. Percival's bare left arm (the inside of her elbow), making direct contact with her skin, where it exploded, causing her arm to catch on fire and start to burn. Upon realizing she had been hit, fellow protestors threw water on her arm. However, her arm was already severely burned—the first layer of her skin turned purple, became raw, and started to peel off.

29.    At no time during this period had the law enforcement officers instructed the protestors to leave or retreat. No warning was given by the law enforcement officers before they began firing projectiles into the group of peaceful protestors. None of the protestors knew where to go or what the law enforcement officers wanted them to do.

30.    After Ms. Percival was hit by the flashbang grenade, she lost track of her friend and began running towards Vermont Avenue and H Street Fellow protestors came to her with water and she put water on her arm to try to soothe the burn.

31.    Ms. Percival made her way to the corner of I Street and Vermont Avenue, where she asked law enforcement officers for help. They refused to speak with her and seemed unconcerned about her injuries. Ms. Percival sought help from other law enforcement officers for several minutes to no avail. Eventually, a woman with experience in treating burns washed her arm off and dressed it with gauze.

32.    Around 12:20 a.m., Ms. Percival's friend found her in the crowd. However, law enforcement officers refused to get her medical attention and refused to let her leave because they had barricaded I Street. Eventually, the woman with experience treating burns convinced police officers that Ms. Percival had second- or third-degree burns and needed immediate medical attention. The law enforcement officers relented and let Ms. Percival and her friend pass through the barricades. They then made  their way to Ms. Percival's car and drove to the emergency room at George Washington University Hospital, in Washington, D.C.

33.    Ms. Percival arrived at the George Washington University Hospital emergency room around 1:00 a.m. on May 31, 2020. When she arrived at the hospital, Ms. Percival had to wait approximately 20–25 minutes before she was seen by hospital staff, during which time she was in excruciating pain.

34.    Ms. Percival was treated in the emergency room. She was diagnosed as having second degree burns on her left arm and chest. Because George Washington University Hospital did not have a burn unit, the doctor had her put her arm under running water for 45–60 minutes, but she still had not received anything to relieve her pain.

35.    Ms. Percival was transferred to Medstar Washington Hospital Center in Washington, D.C. at approximately 6:30 a.m. on May 31, 2020, for further treatment. During her ambulance ride, she finally received pain relievers.

36.    At Medstar Washington Hospital, the doctor applied a cream to Ms. Percival's burns and wrapped them with a compression bandage. She was discharged from the hospital around 5:00 p.m. on May 31, 2020. She was prescribed pain medication for the pain and a cream to apply to the burns, was given fresh bandages, and told to return to the hospital in 5–7 days to redress her burns with fresh bandages. She returned to the burn unit twice for follow-up

appointments and to have the doctor change her bandages. Ms. Percival also saw another doctor who prescribed a cream to help minimize scarring from the burn.

37.    Ms. Percival's left arm was very swollen and painful; she could not use it at all. She had to keep her arm and left chest covered with bandages, with her left arm in a sling, until the burnt, dead skin flaked off.



Photo of burns on Ms. Percival's left arm and chest.



Photo of the burns on Ms. Percival's left hand.



Photo of burns on Ms. Percival's left arm.



Photo of burns on Ms. Percival's left chest.

**Ms. Percival suffered and continues to suffer harm as a result of law enforcement officers' actions on the evening of May 30 and morning of May 31, 2020.**

38.     Ms. Percival has experienced substantial physical, mental, and emotional pain and suffering as a result of law enforcement officers' unprovoked and unlawful violent actions against her on the evening and night of May 30 and early morning of May 31, 2020.

39.     Ms. Percival suffered intense physical pain when law enforcement officers shot projectiles at her and struck her in the left arm. She could not use her arm for several weeks because it was so painful and swollen. This greatly affected her ability to care for herself and, as a single mother, her six-year-old daughter.

40.     Ms. Percival has suffered mental and emotional harm since her injury. In particular, loud noises, such as fireworks, trigger a post-traumatic stress disorder response in her because they remind her of the sound of the flashbang grenades that were going off around her when she was hit by one.

41.     Ms. Percival also has suffered financially as a result of law enforcement officers' actions on the evening and night of May 30 and early morning of May 31, 2020.

42.     Ms. Percival incurred substantial medical expenses as a result of law enforcement officers' actions on the evening and night of May 30 and early morning of May 31, 2020.

43.     Ms. Percival has suffered and will continue to suffer severe physical, mental, and emotional anguish, as well as medical and other related expenses, as a result of the injury to her left arm and chest caused by the defendants on the evening of May 30 and morning of May 31, 2020.

## JURISDICTION, VENUE, AND NOTICE

44.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because this case presents claims arising under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*, and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

45.     Venue is proper in the District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(b)(2) and § 1391(e)(1). Ms. Percival is a resident of the District of Columbia; the District of Columbia is the judicial district in which a substantial part of the events or omissions giving rise to Ms. Percival's claims occurred; and the Defendants in this lawsuit include officers or employees of the United States acting under color of legal authority, as well as the United States itself.

46.    Ms. Percival has exhausted her claims against two of the federal agencies whose employees caused her injury (the U.S. Parks Service and Secret Service).

## CAUSES OF ACTION
### COUNT ONE
(*Bivens* action against John Does 1–10 and John Does 11–20
for violation of Fourth Amendment rights)

47.    Ms. Percival incorporates all allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

48.    Defendants John Does 1–10, federal law enforcement officers at the time of the events in question, acted under color of federal law, when they took violent action against Ms. Percival and other protestors in and near Lafayette Square between the hours of approximately 9:30 p.m. on May 30, 2020, and 12:30 a.m. on May 31, 2020. Defendants John Does 11–20, local law enforcement officers acting at the request and direction of federal law enforcement officers, acted under color of federal law when they took violent action against Ms. Percival and other protestors in and near Lafayette Square during that time.

49.    Ms. Percival has a clearly established Fourth Amendment right to be free from unreasonable and unlawful seizure of his person by law enforcement.

50.    John Does 1–10 and 11–20 violated Ms. Percival's clearly established Fourth Amendment right when, without warning, they fired projectiles at Ms. Percival—who was retreating away from law enforcement and assisting a fellow protestor in an area of Lafayette Square open to the public; did not pose a threat to any person or officer; and was not physically proximate to any other individual who posed such a threat—from a distance of approximately 45 feet, striking Ms. Percival in the left arm and causing second-degree burns to her left arm and chest. John Does 1–10 and 11–20 used this physical force to force Ms. Percival movement and force her to move from Black Lives Matter Plaza towards Vermont Avenue. John Does 1–10 and

11–20 acted without a warrant and without probable cause. It was objectively unreasonable for John Does 1–10 and 11–20 to use such force against Ms. Percival under these facts and circumstances. The use of force was so excessive that no reasonable officer could have believed in the lawfulness of his actions.

51.     The actions of John Does 1–10 and 11–20 proximately caused the physical injury to Ms. Percival's left arm and chest and the mental and emotional pain and suffering that Ms. Percival sustained on May 31, 2020, in the days that followed, continuing to this day, and will continue in the future.

52.     John Does 1–10 and 11–20 acted with intent to violate Ms. Percival's constitutional rights or with deliberate, reckless, and callous indifference or disregard for Ms. Percival's rights and therefore are liable for punitive damages.

53.     John Does 1–10 and 11–20 are jointly and severally liable to Ms. Percival pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971), for this violation of her rights.

**COUNT TWO**
**(Violation of 42 U.S.C. § 1985(3) against John Does 1–10 and John Does 11–20)**

54.     Ms. Percival incorporates all allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

55.     John Does 1–20 and 11–20 conspired to deprive Ms. Percival and other peaceful civil rights protestors in and around Lafayette Square on the evening and night of May 30 and early morning of May 31, 2020, of equal protection of the laws, in violation of 42 U.S.C. § 1985(3). The conspirators were those who engaged in or otherwise were involved in directing or supporting law enforcement actions in and around Lafayette Square during that time, including but not limited to all of John Does 1–10 and 11–20. The conspirators coordinated

through the "unified command" between and among MPD and the federal agencies present at Lafayette Square, agreeing to take collective action against the protestors.

56.    The conspiracy was motivated by a racial and class-based invidiously discriminatory animus. The conspiracy targeted people protesting against police brutality against African Americans and other people of color; in other words, African Americans, other people of color, and "those who champion[] their cause." *United Broth. of Carpenters and Joiners of Am., Local 610, AFL-CIO v. Scott* (*UBCJA*), 463 U.S. 825, 836 (1983). These civil rights protestors constitute a protected class under 42 U.S.C. § 1985(3). Ms. Percival is a member of this protected class.

57.    The purpose of the conspiracy was to deprive, either directly or indirectly, Ms. Percival and other members of the protected class of the equal protection of the laws; specifically, their First Amendment rights to speak, assemble, and petition the Government for redress of grievances, their Fourth Amendment rights to be free from unlawful seizure, and their Fifth Amendment rights not to be deprived of liberty without due process. Ms. Percival and other members of this protected class were targeted because of the viewpoints of the protected class.

58.    The conspirators engaged in overt acts in furtherance of the conspiracy, including but not limited to using violent force against members of the protected class in and around Lafayette Square who were peacefully exercising their First Amendment rights and, specifically, shooting Ms. Percival in the left arm with a flashbang grenade.

59.    The conspirators caused Ms. Percival's physical injuries and deprived her of equal protection under the law as a result of their conduct. John Does 1–10 and 11–20 acted with intent to violate Ms. Percival's constitutional rights or with reckless and callous indifference or disregard for Ms. Percival's rights and therefore are liable for punitive damages.

### COUNT THREE
**(Violation of 42 U.S.C. § 1986 against John Does 1–10 and John Does 11–20)**

60.    Ms. Percival incorporates all allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

61.    John Does 1–10 and 11–20, who collectively participated in the removal of protestors from in and around Lafayette Square on the evening of May 30 and morning of May 31, 2020, knew that there existed a conspiracy to deprive the civil rights protestors in and around Lafayette Square on the evening and night of May 30 and early morning of May 31, 2020, of their constitutional rights through the use of force.

62.    John Does 1–1 and 11–20 had the power to prevent or aid in preventing the commission of that conspiracy but negligently failed or refused to do so. The defendants with decision-making authority in the "unified command" between and among MPD and the federal agencies present in and around Lafayette Square could and should have refused to issue unlawful orders to use physical force against peaceful civil rights protestors, including Ms. Percival, or issued orders to halt the unlawful use of force against peaceful civil rights protestors. The defendants with subordinate roles, operating pursuant to the orders of the "unified command," between MPD and the federal agencies present in and around Lafayette Square could and should have refused to comply with unlawful orders, including the order to use physical force against Ms. Percival and other peaceful civil rights protestors.

63.    In light of that negligent or intentional failure or refusal, overt acts in furtherance of the conspiracy were carried out, resulting in violence that deprived Ms. Percival of her constitutional rights, and which caused physical injury to Ms. Percival.

64.    John Does 1–10 and 11–20 acted with intent to violate Ms. Percival's constitutional rights or with deliberate, reckless, and callous indifference or disregard for Ms. Percival's rights and therefore are liable for punitive damages.

## COUNT FOUR
**(Assault against the United States of America)**

65.    Ms. Percival incorporates all allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

66.    At all times, John Does 1–10 were federal law enforcement officers acting within the scope of their employment at or near Lafayette Square between approximately 9:00 p.m. on May 30, 2020, and approximately 12:30 a.m. on May 31, 2020.

67.    John Does 1–10 intentionally and unlawfully attempted and threatened physical harm to Ms. Percival and other civil rights protestors when they fired canisters of chemical irritants and projectiles, including rubber bullets and flashbang grenades, into the crowd of peaceful protestors in Lafayette Square from a short distance away on May 30 and May 31, 2020. The actions of John Does 1–10 involved excessive use of force and were not reasonable under the circumstances.

68.    John Does 1–10 caused Ms. Percival to suffer apprehension of harmful and offensive contact when John Does 1–10 intentionally fired canisters of chemical irritants and projectiles, including rubber bullets and flashbang grenades, into the crowd of protestors of which Ms. Percival was a part.

69.    A reasonable person in Ms. Percival's position would have experienced such apprehension.

70.    The actions or omissions by John Does 1–10 described herein constitute the tort of assault under the laws of the District of Columbia.

71.     A private individual would be liable for assault under like circumstances. Therefore, the United States of America is liable under the FTCA.

72.     John Does 1–10 were investigative or law enforcement officers within the meaning of 28 U.S.C. § 2680(h).

## COUNT FIVE
### (Battery against the United States of America)

73.     Ms. Percival incorporates all allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

74.     At all times, John Does 1–10 were federal law enforcement officers acting within the scope of their employment at or near Lafayette Square between approximately 9:00 p.m. on May 30, 2020, and approximately 12:30 a.m. on May 31, 2020.

75.     John Does 1–10 intentionally, knowingly, and wrongfully caused harmful and offensive contact to Ms. Percival's body when John Does 1–10 fired projectiles, including rubber bullets, at Ms. Percival from a short distance, without provocation or warning, striking her in the left leg and causing injury to her left leg.

76.     John Does 1–10 intentionally, knowingly, and wrongfully caused harmful and offensive contact to Ms. Percival's body when John Does 1–10 fired projectiles, including flashbang grenades, at Ms. Percival from a short distance, without provocation or warning, striking her in the left arm and causing injury to her left arm and chest.

77.     Ms. Percival did not consent to the contact.

78.     John Does 1–10 acted with intent to cause injury and did cause injury, damage, loss, and harm to Ms. Percival as a result of their wrongful actions.

79.     The actions or omissions by John Does 1–10 described herein constitute the tort of battery under the laws of the District of Columbia.

80.      A private individual would be liable for battery under like circumstances. Therefore, the United States of America is liable under the FTCA.

81.      John Does 1–10 were investigative or law enforcement officers within the meaning of 28 U.S.C. § 2680(h).

## COUNT SIX
### (Negligence against the United States of America)

82.      Ms. Percival incorporates all allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

83.      At all times, John Does 1–10 were federal law enforcement officers acting within the scope of their employment at or near Lafayette Square between 9:00 p.m. on May 30, 2020, and approximately 12:30 a.m. on May 31, 2020.

84.      As federal law enforcement officers, John Does 1–10 had a duty of reasonable care to refrain from injuring members of the public, like Ms. Percival, especially when engaged in activities that pose a risk of great harm, such as firing flashbang grenades.

85.      John Does 1–10 breached their duty of care to act with the care and skill of reasonably competent officers when firing at a crowd of people, including Ms. Percival, without provocation or warning, while Ms. Percival was standing only a few feet away, exercising her First Amendment rights in a lawful and peaceful manner, and assisting a fellow protestor who had fallen off his or her bike.

86.      As a direct and proximate result of the negligent actions of John Does 1–10, Ms. Percival was hit in the left arm with a projectile and sustained second-degree burns. She had to seek immediate, emergency medical attention, and may have permanent scarring on her left arm and chest.

87.     The actions or omissions by John Does 1–10 described herein constitute the tort of negligence under the laws of the District of Columbia.

88.     A private individual would be liable for negligent infliction of emotional distress under like circumstances. Therefore, the United States of America is liable under the FTCA.

89.     John Does 1–10 were investigative or law enforcement officers within the meaning of 28 U.S.C. § 2680(h).

## COUNT SEVEN
### (Negligent Supervision against the United States of America)

90.     Ms. Percival incorporates all allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

91.     At all times, John Does 1–10 were federal law enforcement officers acting within the scope of their employment at or near Lafayette Square between 9:00 p.m. on May 30, 2020, and approximately 12:30 a.m. on May 31, 2020.

92.     John Does 1–10 fired a flashbang grenade at a crowd of people, including Ms. Percival, without provocation or warning, while Ms. Percival was standing only 15 feet away, exercising her First Amendment rights in a lawful and peaceful manner, and assisting a fellow protestor who had fallen off his or her bike.

93.     Defendant United States of America had a duty of reasonable care to supervise John Does 1–10 in performing their duties as federal law enforcement officers. A reasonable and prudent supervisory law enforcement officer would have instructed subordinate officers either not to fire flashbang grenades in these circumstances or to fire them into the air because firing these projectiles a people can result in serious injury (and has in this case). Ms. Percival is a member of the public who would foreseeably come into contact with John Does 1–10. Therefore,

Defendant United States of America owed a duty of care to Ms. Percival, and such duty was breached.

94.     As a direct and proximate result of Defendant United States of America's negligent failure to supervise John Does 1–10, Ms. Percival was hit in the left arm with a projectile and sustained second-degree burns. She had to seek immediate, emergency medical attention, and may have permanent scarring on her left arm and chest.

95.     The actions or omissions by the United States of America described herein constitute the tort of negligence under the laws of the District of Columbia.

96.     A private individual would be liable for negligent infliction of emotional distress under like circumstances. Therefore, the United States of America is liable under the FTCA.

97.     John Does 1–10 were investigative or law enforcement officers within the meaning of 28 U.S.C. § 2680(h).

**COUNT EIGHT**
**(Negligent infliction of emotional distress against the United States of America)**

98.     Ms. Percival incorporates all allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

99.     At all times, John Does 1–10 were federal law enforcement officers acting within the scope of their employment at or near Lafayette Square between 9:00 p.m. on May 30, 2020, and approximately 12:30 a.m. on May 31, 2020.

100.     John Does 1–10 acted negligently when firing at Ms. Percival, without provocation or warning, while Ms. Percival was standing only a few feet away, exercising her First Amendment rights in a lawful and peaceful manner, and assisting a fellow protestor who had fallen off his or her bike.

101.    Because John Does 1–10 fired directly at, and hit, Ms. Percival, she was within the zone of physical danger from their actions. The negligent decision to fire at Ms. Percival caused her to fear for her own safety.

102.    As a result of the negligent actions of John Does 1–20, Ms. Percival was hit in the left arm with a projectile, had to seek immediate, emergency medical attention, and may have permanent scarring on her left arm and chest.

103.    The negligent actions of John Does 1–10 caused Ms. Percival to suffer severe emotional distress, which has manifested itself in symptoms including, but not limited to, a post-traumatic stress reaction to loud noises.

104.    The actions or omissions by John Does 1–10 described herein constitute the tort of negligent infliction of emotional distress under the laws of the District of Columbia.

105.    A private individual would be liable for negligent infliction of emotional distress under like circumstances. Therefore, Defendant the United States of America is liable under the FTCA.

106.    John Does 1–10 were investigative or law enforcement officers within the meaning of 28 U.S.C. § 2680(h).

**COUNT NINE**
**(Intentional infliction of emotional distress against the United States of America)**

107.    Ms. Percival incorporates all allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

108.    At all times, John Does 1–10 were federal law enforcement officers acting within the scope of their employment at or near Lafayette Square between approximately 9:00 p.m. on May 30, 2020, and approximately 12:30 a.m. on May 31, 2020.

109.    John Does 1–10 acted intentionally when firing at Ms. Percival, without provocation or warning, while Ms. Percival was standing only a few feet away, exercising her First Amendment rights in a lawful and peaceful manner, and assisting a fellow protestor who had fallen off his or her bike.

110.    John Does 1–10 acted recklessly when firing at Ms. Percival, without provocation or warning, while Ms. Percival was standing only a few feet away, exercising her First Amendment rights in a lawful and peaceful manner, and assisting a fellow protestor who had fallen off his or her bike.

111.    John Does 1–10 used violent and excessive force against Ms. Percival—without probable cause—while she was peacefully exercising her First Amendment rights in a public forum. As a result, Ms. Percival was hit in the left arm with a flashbang grenade, had to seek immediate, emergency medical attention, and may have permanent scarring on her left arm and chest. The actions of John Does 1–10 under these facts and circumstances were extreme, outrageous, objectively unreasonable, go beyond all possible bounds of decency, and must be regarded as atrocious and utterly intolerable in a civilized community.

112.    John Does 1–10 caused Ms. Percival to suffer severe emotional distress, which has manifested itself in symptoms including, but not limited to, a post-traumatic stress reaction to loud noises.

113.    The actions or omissions by John Does 1–10 described herein constitute the tort of intentional infliction of emotional distress under the laws of the District of Columbia.

114.    A private individual would be liable for intentional infliction of emotional distress under like circumstances. Therefore, Defendant the United States of America is liable under the FTCA.

115.    John Does 1–10 were investigative or law enforcement officers within the meaning of 28 U.S.C. § 2680(h).

## PRAYER FOR RELIEF

WHEREFORE, Ms. Percival demands judgment against the Defendants, jointly and severally, as follows:

a.    A judgment declaring that the acts of the Defendants described herein violated the First Amendment, the Fourth Amendment, and Fifth Amendment to the United States Constitution, 42 U.S.C. §§ 1985 and 1986, and the Federal Tort Claims Act, and constituted assault, battery, negligence, and intentional infliction of emotional distress;

b.    Compensatory damages in an amount to be determined at trial;

c.    Punitive damages;

d.    An award of the costs and expenses of this action, including attorneys' fees;

e.    Pre-judgment and post-judgment interest; and

f.    Any further relief that this Court may deem appropriate.

## JURY DEMAND

Pursuant to the Seventh Amendment of the United States Constitution and Fed. R. Civ. P. 38(b), Ms. Percival requests a jury trial on all issues and claims raised by this Complaint that are triable of right by a jury.

Dated: May 27, 2022                    Respectfully submitted,

                                       */s/ Monica R. Basche*
                                       Anisha S. Queen (DC Bar No. 1029963)
                                       Monica R. Basche (DC Bar No. MD0105)
                                       Andrew D. Freeman (*admission forthcoming*)
                                       Brown, Goldstein & Levy, LLP
                                       120 E. Baltimore Street, Suite 2500
                                       Baltimore, Maryland 21202

Tel: (410) 962-1030
Fax: (410) 385-0869
aqueen@browngold.com
mbasche@browngold.com
adf@browngold.com